**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

HECTOR SOTO-ZUNIGA,
*Defendant-Appellant.*

No. 14-50529

D.C. No.
3:13-cr-02706-AJB-1

OPINION

Appeal from the United States District Court
for the Southern District of California
Anthony J. Battaglia, District Judge, Presiding

Argued and Submitted May 5, 2016
Pasadena, California

Filed September 16, 2016

Before: Alex Kozinski, William A. Fletcher,
and Ronald M. Gould, Circuit Judges.

Opinion by Judge Gould

# SUMMARY[*]

## Criminal Law

The panel vacated a jury conviction for possession with intent to distribute methamphetamine, reversed discovery rulings, and remanded with instructions.

The panel held that the district court abused its discretion by denying the defendant's pretrial motion for discovery relating to the constitutionality of a Border Patrol checkpoint at which the defendant was detained and his car searched. The panel concluded that discovery of the checkpoint search and arrest statistics was pertinent to the issue whether the checkpoint was invalid under the Fourth Amendment because its primary purpose was to advance the general interest in crime control, rather than to control immigration. The panel held that this issue of the constitutionality of a search or seizure was subject to discovery under Federal Rule of Criminal Procedure 16(a)(1)(E). The panel reversed the district court's denial of the discovery motion relating to the checkpoint's arrest statistics and remanded for the district court to assess the constitutionality of the checkpoint in further proceedings.

The panel held that the district court abused its discretion by denying the defendant's motion for discovery on the government's investigation into a drug smuggling operation. After reviewing sealed documents submitted by the government, the panel concluded that the documents were

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

discoverable because they were material to preparing the defense under Rule 16(a)(1)(E). The panel reversed the denial of the discovery motion, vacated the conviction, and remanded with instructions to grant the motion. The panel also instructed the district court to consider the government's request for a window of time before production to determine whether to continue to pursue the case, and to consider the government's request for protective measures that would maintain the security of the information in the documents while allowing the defense to adequately prepare a defense.

The panel affirmed the denial of a suppression motion insofar as it was based on a claimed lack of probable cause for the search of the defendant's car. The panel held that the district court did not err in instructing the jury on reasonable doubt. It also held that knowledge of drug type and quantity is not an element of possession with intent to distribute in violation of 21 U.S.C. § 841.

## COUNSEL

Paul Allen Barr (argued), Federal Defenders of San Diego, Inc., San Diego, California, for Defendant-Appellant.

Kyle B. Martin (argued), Assistant United States Attorney; Peter Ko, Chief, Appellate Section, Criminal Division; Laura E. Duffy, United States Attorney; United States Attorney's Office, San Diego, California; for Plaintiff-Appellee.

**OPINION**

GOULD, Circuit Judge:

Hector Soto-Zuniga appeals his jury conviction for possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1). Soto-Zuniga was arrested at a checkpoint in San Clemente, California, after Border Patrol agents found 2.9 kilograms of methamphetamine on the floor of the backseat of his car during a search. Before the first trial, which ultimately resulted in a hung jury and a mistrial, Soto-Zuniga filed motions to suppress the drug evidence. In one of the motions he argued that the checkpoint was unconstitutional and requested discovery of the checkpoint's arrest and search statistics. The district court denied these motions.

At both his first trial and his subsequent re-trial, Soto-Zuniga testified that before being stopped at the checkpoint, he had given a ride to three teenagers he did not know as a favor to his cousin's husband, Christian Rios Campos.[1] The government stipulated that Rios was a known drug smuggler who recruited juveniles to smuggle drugs into the United States, and Soto-Zuniga's primary defense was that the teenagers had planted the drugs in the car without his knowledge. Before the second trial, Soto-Zuniga moved for discovery of the government's investigation of Rios's drug smuggling operation, which may have identified the three teenagers by name. This, too, was denied. Soto-Zuniga was convicted after the second jury trial and sentenced to six years in prison.

---

[1] Although this individual's name appears in several spellings in the record, we use this version throughout this opinion for consistency.

Soto-Zuniga raises several arguments on appeal, and we conclude that two have merit: (1) the district court abused its discretion by denying Soto-Zuniga's pretrial motion for discovery relating to the constitutionality of the San Clemente checkpoint, and (2) the district court abused its discretion by denying Soto-Zuniga's motion for discovery on Rios's drug smuggling operation. We have jurisdiction under 28 U.S.C. § 1291, and we reverse the district court's rulings on the discovery motions, vacate the conviction, and remand for further proceedings consistent with this opinion.

# I

On June 29, 2013, at around 3:50 p.m., Soto-Zuniga was stopped in his car at a Border Patrol checkpoint near San Clemente, California. U.S. Border Patrol Agent Ivan Favela questioned Soto-Zuniga, who told Agent Favela that he was coming from Tijuana. Agent Favela testified at trial that Soto-Zuniga appeared nervous and that his hands were shaking. Agent Favela directed Soto-Zuniga to a secondary inspection area. There, two additional agents, Raymond Rabreau and Brian Chang, approached Soto-Zuniga's car. Soto-Zuniga presented Agent Chang with a Permanent Resident Card and told Agent Chang that he was traveling to Los Angeles from Tijuana. Agent Chang later reported that he noticed Soto-Zuniga's hand and leg shaking during the exchange. Based on this nervous behavior, Agent Chang asked Soto-Zuniga to step out of the car. Agent Chang said that when he asked Soto-Zuniga if he had any contraband in his car, Soto-Zuniga looked down before answering "no." Agent Chang then asked Soto-Zuniga to open the trunk of his car, and he complied. According to Agent Chang, Soto-Zuniga continued to fidget during their exchange. Agent Rabreau, who approached Soto-Zuniga's car from the

passenger's side, later reported that he smelled marijuana coming from the vehicle, and he observed a "black and mild cigarillo" in the car's ashtray, as well as remnants of tobacco. Agent Rabreau reported that, based on his training and experience, he suspected Soto-Zuniga had been smoking marijuana in the car.

Next, a third agent at the secondary checkpoint, Anthony Rodgers, also noticed that Soto-Zuniga was acting nervously and observed that the carotid artery in his neck was "bounding." Agent Rodgers wrote in his report that Soto-Zuniga admitted to smoking marijuana in the car with a friend. Agent Rodgers also reported that he performed a *Terry* frisk[2] of Soto-Zuniga, but found no weapons.

Other agents soon approached the secondary inspection area, including Agents Favela and Buck. Agent Buck later reported that he questioned Soto-Zuniga about smoking marijuana, and that Soto-Zuniga denied ever smoking marijuana, but admitted that he had friends that smoked. Agent Buck reported that he then asked Soto-Zuniga if he allowed friends to smoke marijuana in his car, and Soto-Zuniga "became very defensive and became visibly agitated with [his] questioning." Agent Buck also wrote that when he told Soto-Zuniga that his car would be searched because of the smell of marijuana, Soto-Zuniga "adopted a defeated body posture."

Agent Rodgers's report reflects that, due to Soto-Zuniga's alleged admission that he had smoked marijuana in the car and the smell that Agent Rabreau reported, agents decided to search Soto-Zuniga's car at about 4:25 p.m., approximately

---

[2] *See Terry v. Ohio*, 392 U.S. 1 (1968).

35 minutes after the initial stop. In searching the car, Agent Favela recovered four bundles wrapped in brown tape from behind the driver's seat. The bundles were under a floor mat, which was also covered by a sweater. A field test indicated that the bundles contained methamphetamine, and Soto-Zuniga was arrested. Evidence at trial established that the bundles contained 2.9 kilograms of methamphetamine, with a street value of more than $80,000.

Soto-Zuniga was subsequently interviewed by Agent Kameron Korte, who testified that Soto-Zuniga waived his *Miranda*[3] rights through the Spanish translation of another Border Patrol agent. During that interrogation, Soto-Zuniga told Agent Korte that his cousin's husband, Christian Rios Campos, had called that morning and asked Soto-Zuniga to give a ride to three teenagers from Otay Mesa to San Ysidro in San Diego. Soto-Zuniga told Agent Korte that he picked up the teenagers at a McDonald's in Otay Mesa and dropped them off at a Shell gas station close to a trolley station in San Ysidro. By the time Agent Korte contacted the McDonald's, any video surveillance had been erased. Agent Korte never contacted the Shell station.

Soto-Zuniga was charged with possession of methamphetamine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Before trial, he filed a motion to suppress the drugs seized from his car, arguing that they were the fruits of an unlawful search and seizure. Soto-Zuniga contended that the agents lacked probable cause to detain him and search his car; specifically, he argued that nervousness alone was not sufficient to support probable cause, and that Agent Rabreau's report that he smelled marijuana coming

---

[3] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

from the car was "unreliable" because no other agent reported the smell and no marijuana was recovered from the car. He also filed a motion challenging the constitutionality of the San Clemente checkpoint, arguing that the government was using the checkpoint as a pretext to search for controlled substances, not to control immigration. In an unsuccessful attempt to support that argument for his suppression motion, Soto-Zuniga also filed a motion seeking, *inter alia*, discovery of statistics regarding the number and types of arrests and vehicle searches at the San Clemente checkpoint.

The district court held an evidentiary hearing on the pretrial motions. At the hearing, Agent Rabreau testified that the main purpose of the San Clemente checkpoint was immigration inspection and that 90 percent of the arrests were immigration-related. He also detailed his account of the events that led to Soto-Zuniga's arrest, including smelling marijuana coming from Soto-Zuniga's car and seeing a "burnt blunt," which he described as a burned marijuana-filled cigarillo, in the ashtray, as well as a small amount of loose tobacco, a "black & mild wrapper," and a lighter. He testified that this was "consistent with marijuana paraphernalia." Agent Rabreau also testified that the car had four air fresheners, something "many smugglers use . . . to mask the smell of their drug load." He further testified that he believed Agents Chang and Buck smelled marijuana as well, and that the smell was the reason Agent Favela initially sent Soto-Zuniga to secondary inspection. On cross-examination, Agent Rabreau said that, to his knowledge, no marijuana was ever recovered from the car. Agent Rabreau also testified that Soto-Zuniga had provided an "inconsistent route of travel," but acknowledged that he did not include this information in his report.

In a declaration, Soto-Zuniga claimed that he had not smoked marijuana in five or more years and that he had told Agent Buck that he did not smoke marijuana. Soto-Zuniga also said that he told Agent Buck that none of his friends had smoked marijuana in the car. When called to testify during the evidentiary hearing, Soto-Zuniga testified consistently with his declaration on these points.

The district court denied Soto-Zuniga's motions to suppress and to compel discovery. The district court reasoned that "the sequence of events [in the agents' reports] seems to be very consistent," and that there was probable cause based on several factors, including the smell of the marijuana, Soto-Zuniga's reported nervousness, the air fresheners, the loose tobacco, the cigarillo wrappers, and Agent Rodgers's report that Soto-Zuniga admitted to him that he had smoked marijuana in the car. The court noted that the physical evidence was "where it nails the coffin here." The court further noted that, while Agent Rabreau was the only agent who claimed to smell the marijuana, other agents reported that Agent Rabreau had told them he smelled marijuana at the scene so it was not "a post-arrest revelation." The court also found that the testimony of Agent Rabreau, "with regard to his role, his experience in terms of his own arrests, and then his happening to be the conduit through which reports pass, all support [the conclusion that] the primary purpose of this checkpoint is immigration." The case was set for trial.

Before the start of the first trial and after jury selection, an investigator for the defense obtained a social security number for Marisol Diaz, Soto-Zuniga's cousin and the wife of Christian Rios Campos. The investigator then got an arrest warrant for Diaz, which included a declaration from a

Homeland Security Investigations agent that the government had arrested three teenagers on suspicion of trafficking drugs at the command of Rios. Defense counsel argued that this new information corroborated Soto-Zuniga's account of events. The district court postponed the trial until the next day. Defense counsel next filed an emergency motion for a continuance to permit time to investigate the new information. The government stipulated to the information contained in the declaration, including that Rios had recruited teenagers to traffic drugs. The district court concluded that the stipulation was sufficient to meet the defense's purpose, and denied the motion for a continuance as well as defense counsel's subsequent motion for a mistrial.

During the trial, Soto-Zuniga sought specific jury instructions that differed from the Ninth Circuit pattern jury instructions on reasonable doubt. He also asked that the jury be instructed that the government must prove beyond a reasonable doubt that Soto-Zuniga "knew the substance [that he possessed with intent to distribute] was 2.92 kilograms of methamphetamine." The district court rejected both suggestions in favor of the pattern jury instructions. Following the trial, the jury was unable to reach a unanimous decision, resulting in a mistrial.

Before the second trial, Soto-Zuniga requested discovery on the government's investigation of Christian Rios Campos and Marisol Diaz, including any relevant information regarding the three teenagers who were arrested for trafficking at Rios's command. The district court reviewed the written materials related to the government's investigation and denied the motion, stating that any investigation of Rios was "collateral. It is irrelevant. It is predominately inadmissible in the forms in which you have it, and that's the

ruling." The district court also said that discovery would extend the litigation and would present "a 403 problem[⁴] in spades." At the end of the second trial, the jury was instructed with the same jury instructions used in the first trial—after the district court noted that Soto-Zuniga had preserved all prior objections. The jury returned a guilty verdict.

At sentencing, Soto-Zuniga argued that the statutory maximum sentence should only be one year because the jury had not found that he had possessed a particular quantity of methamphetamine. The district court rejected this claim and sentenced Soto-Zuniga to 72 months (six years).

## II

We review discovery rulings for abuse of discretion. *United States v. Amlani*, 111 F.3d 705, 712 (9th Cir. 1997). To reverse Soto-Zuniga's conviction, we must find that the district court abused its discretion in denying his discovery motions, and that the error resulted in prejudice to his substantial rights, *i.e.*, that there is "a likelihood that the verdict would have been different had the government complied with the discovery rules." *United States v. de Cruz*, 82 F.3d 856, 866 (9th Cir. 1996) (citation and internal quotation marks omitted).

---

⁴ The district court was doubtless referring to Fed. R. Evid. 403, which states that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

**A**

We first address Soto-Zuniga's argument that the district court abused its discretion in denying his motion for discovery of the San Clemente checkpoint search and arrest statistics.  He contends that this evidence is necessary to determine whether the checkpoint itself is constitutional.  We agree that the district court abused its discretion in denying discovery that could have revealed an unconstitutional seizure and led to the suppression of the evidence that illicit drugs were found in Soto-Zuniga's car.

The Fourth Amendment prohibits unreasonable searches and seizures.  "It is well established that a vehicle stop at a highway checkpoint effectuates a seizure within the meaning of the Fourth Amendment." *City of Indianapolis v. Edmond*, 531 U.S. 32, 40 (2006).  As a general rule, a search or seizure is unreasonable unless it rests on individualized suspicion of wrongdoing.  *Id.* at 37.  But the Supreme Court has carved out an exception to this rule for checkpoint seizures that serve "special needs, beyond the normal need for law enforcement."  *Id.* (citation and internal quotation marks omitted); *see also United States v. Fraire*, 575 F.3d 929, 931–32 (9th Cir. 2009).  In *United States v. Martinez-Fuerte*, which addressed the constitutionality of the San Clemente checkpoint, the Supreme Court identified immigration control as a valid purpose for stopping cars and posing questions without individualized suspicion.  428 U.S. 543, 556–64 (1976).  The Court rejected a Fourth Amendment challenge to the checkpoint, recognizing "that maintenance of a traffic-checking program in the interior is necessary because the flow of illegal aliens cannot be controlled effectively at the border."  *Id.* at 556.  The Court also "stressed the impracticality of the particularized study of a given car to

discern whether it was transporting illegal aliens, as well as the relatively modest degree of intrusion entailed by the stops." *Edmond*, 531 U.S. at 38 (citing *Martinez-Fuerte*, 428 U.S. at 556–64).

The constitutionality of immigration checkpoints, including the San Clemente checkpoint, was raised again nearly two decades later in a separate case before our Court. *See United States v. Soyland*, 3 F.3d 1312 (9th Cir. 1993). In *Soyland*, the defendants' car was searched at an immigration checkpoint's secondary inspection, revealing drug paraphernalia and small amounts of marijuana. *Id.* at 1314. A subsequent search of the defendants revealed 220 grams of methamphetamine and a scale. *Id.* The majority declined to address "the issue of whether checkpoint officers routinely overstep their authority by conducting pretextual narcotics searches," noting that it had not been argued at trial nor on appeal. *Id.* Judge Kozinski dissented, voicing his concern that the San Clemente checkpoint and others like it may be violating restrictions on suspicionless searches. *Id.* at 1315–20 (Kozinski, J., dissenting). While recognizing that *Martinez-Fuerte* approved internal checkpoints for immigration control purposes, Judge Kozinski warned that "[t]here's reason to suspect the agents working these checkpoints are looking for more than illegal aliens. If this is true, it subverts the rationale of *Martinez-Fuerte* and turns a legitimate administrative search into a massive violation of the Fourth Amendment." *Id.* at 1316. He recommended remanding the case for a factual inquiry into "whether the policies, programs, directives and incentives put in place by the government, or any customs and practices that have developed with the government's tacit approval, have turned . . . San Clemente into [a] general law enforcement checkpoint[]." *Id.* at 1319 (footnote omitted).

Although Judge Kozinski's dissent primarily discussed the searches that occur at the San Clemente checkpoint, his concerns are also relevant to the initial seizure—the vehicle stop—at issue in Soto-Zuniga's case. In *City of Indianapolis v. Edmond*, the Supreme Court clarified that the constitutionality of suspicionless immigration checkpoints is governed by the same standard as administrative searches. 531 U.S. at 37–38. The Court also reaffirmed that checkpoints with the principal purpose of thwarting criminal activity do not comport with the Fourth Amendment, and noted that it had "never approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing," as opposed to purposes of "policing the border" or "ensuring roadway safety." 531 U.S. at 38, 41. The constitutionality of the San Clemente checkpoint turns on whether its "primary purpose" is to control immigration, as has been contended by the government, or rather is to interdict drug trafficking and other "ordinary criminal wrongdoing." *Id.*; *see also Fraire*, 575 F.3d at 932 ("[T]he court must determine whether the primary purpose of the checkpoint was to advance the general interest in crime control. If so, then the stop is per se invalid under the Fourth Amendment." (internal citations, quotation marks, and alterations omitted)). If the checkpoint's primary purpose is to detect evidence of drug trafficking, then the initial seizure of Soto-Zuniga's car and person offended the Fourth Amendment and the drug evidence recovered from his car must be excluded as fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963).

It is on this issue that the requested discovery is pertinent. Although the district court held an evidentiary hearing to determine the checkpoint's primary purpose, the only evidence before it was the testimony of Agent Rabreau and

several news articles, including a few detailing the interdiction of narcotics.  Based on Agent Rabreau's testimony that he had reviewed seizure and arrest records and that upwards of 90 percent of arrests were immigration related, the district court concluded that the checkpoint was constitutional and denied further discovery of the search and arrest statistics.

It may well be that Agent Rabreau's experience and knowledge is consistent with the general practices at the San Clemente checkpoint.  But there is a risk that the district court made its decision as if in part blindfolded, considering only one version of the evidence.  Our system of criminal justice relies on an adversary system to help ensure that justice will be done.

Under Federal Rule of Criminal Procedure 16(a)(1)(E), the government is required to produce, *inter alia*, documents or data "if the item is within the government's possession, custody, or control and . . . the item is material to preparing the defense."  The government, relying on *United States v. Armstrong*, 517 U.S. 456 (1996), contends that Soto-Zuniga is not entitled to discovery under this Rule because the evidence he seeks is not material to his defense against the government's case-in-chief.  *Armstrong*, which concerned discovery in a selective prosecution case, held that Rule 16(a)(1)(E)[5] does not permit discovery of government documents in selective-prosecution claims because such discovery does not assist in "the preparation of their defense against the Government's case in chief."  *Id.* at 463.  The Supreme Court in *Armstrong* analyzed the meaning of the

---

[5] *Armstrong* refers to Fed. R. Crim. P. 16(a)(1)(C), which was recodified at 16(a)(1)(E) in the 2002 Amendments.

term "defense" in the context of the Rule 16(a)(1)(E) and reasoned that "[w]hile it might be argued that as a general matter, the concept of a 'defense' includes any claim that is a 'sword,' challenging the prosecution's conduct of the case, the term may encompass only the narrower class of 'shield' claims, which refute the Government's arguments that the defendant committed the crime charged." *Id.* at 462.

Notwithstanding that language and guidance of the Supreme Court, we do not read *Armstrong* to preclude Rule 16(a)(1)(E) discovery related to the constitutionality of a search or seizure. In our view, the holding of *Armstrong* applies to the narrow issue of discovery in selective-prosecution cases. *See id.* at 471 (Ginsburg, J., concurring) ("I do not understand the Court to have created a major limitation on the scope of discovery available under Federal Rule of Criminal Procedure 16. As I see it, the Court has decided a precise issue: whether the phrase 'defendant's defense,'[6] as used in Rule [16(a)(1)(E)], encompasses allegations of selective prosecution . . . . The Court was not called upon to decide here whether Rule [16(a)(1)(E)] applies in any other context, for example, to affirmative defenses unrelated to the merits." (citation omitted and internal quotation marks omitted)). Also, our post-*Armstrong* case law within the Ninth Circuit indicates that Rule 16(a)(1)(E) permits discovery related to the constitutionality of a search or seizure. In *United States v. Cedano-Arellano*, a defendant charged with cocaine smuggling sought discovery of the training records of the narcotics detector dog that "alerted" on his gas tank. 332 F.3d 568, 570 (9th Cir. 2003) (per curiam). We acknowledged that the materials at issue "were crucial to

---

**6** The previous version of Rule 16(a)(1)(E) permitted discovery "material to the preparation of the defendant's defense."

[the defendant's] ability to assess the dog's reliability, a very important issue in his defense, and to conduct an effective cross-examination of the dog's handler" at the pretrial evidentiary hearing. *Id.* at 571. We held that such materials were discoverable under Rule 16(a)(1)(E). *Id.*; *see also United States v. Thomas*, 726 F.3d 1086, 1096–97 (9th Cir. 2013) (defendant was entitled under Rule 16(a)(1)(E) to discovery of unredacted training and certification records of a narcotics detector dog). *Cedano-Arellano* and *Thomas* support the conclusion that Rule 16(a)(1)(E) permits discovery to determine whether evidence in a particular case was obtained in violation of the Constitution and is thus inadmissible.

The government argues that *Cedano-Arellano* and *Thomas* created a narrow "dog discovery" exception to the general rule that *Armstrong* establishes. The government points to our precedent in *United States v. Chon*, in which the defendants were convicted of theft and conversion of government property after they broke into a Naval facility and stole military equipment. 210 F.3d 990, 992 (9th Cir. 2000). The defendants were caught and charged as a result of a Naval Criminal Investigative Service (NCIS) investigation. Before the trial, the defendants moved for discovery on any activities of the NCIS and its predecessor agency that targeted civilians to bolster their claim that NCIS violated the Posse Comitatus Act (PCA), which prohibits the military from participating in civilian law enforcement. *Id.* at 992–93. We affirmed the district court's determination that this request was a "far reaching fishing expedition." *Id.* at 992. We held that the discovery request was "considerably broader" than any materials that could be relevant to the specific charges against the defendants and that the requested discovery did

"not serve the purpose of fortifying the appellants' 'shield claims.'"  *Id.* at 995.

*Chon* turns on the determination that the requested discovery had no relevance to whether NCIS violated the PCA in the defendants' particular case.  The materials sought were expansive, "implicating widespread and repeated violations of the PCA in the State of Hawaii and within the United States."  *Id.* at 994.  By contrast, Soto-Zuniga sought discovery of whether he and his automobile were unconstitutionally seized at the San Clemente checkpoint—an issue that is central to his defense, because it could spell the difference in a suppression motion of the key physical evidence against him.  Because the primary purpose of the San Clemente checkpoint was placed squarely at issue by Soto-Zuniga's motion to suppress, defense counsel should have been allowed reasonable discovery relating to this primary purpose.  After that discovery, and with all material evidence on the table, the district court would have been in a superior position to assess and decide the motion to suppress.

It has been forty years since the San Clemente checkpoint was upheld by the Supreme Court as constitutional. *Martinez-Fuerte*, 428 U.S. at 556–64.  Whether the primary purpose of the checkpoint has evolved from controlling immigration to detecting "ordinary criminal wrongdoing," *see Edmond*, 531 U.S. at 42, is a question that is subject to discovery under Rule 16.  Soto-Zuniga "should not have to rely solely on the government's word that further discovery is unnecessary."  *United States v. Budziak*, 697 F.3d 1105, 1113 (9th Cir. 2012).  We conclude that the district court abused its discretion by denying this discovery.  *See de Cruz*, 82 F.3d at 866.  However, because we do not have access to the records in question, we cannot determine the likelihood of

whether Soto-Zuniga's case would have had a different outcome had he been permitted discovery. *Id*. The proper course under such circumstances is to remand for discovery and an evidentiary determination. *See Thomas*, 726 F.3d at 1097–98; *see also United States v. Doe*, 705 F.3d 1134, 1151–52 (9th Cir. 2013). We reverse the district court's denial of the discovery motion relating to the checkpoint's arrest statistics, and remand for the district court to assess the constitutionality of the San Clemente checkpoint in further proceedings. *See id.* at 1097–98.

**B**

We also reverse the district court's denial of discovery of the government's investigation into Rios's drug smuggling operation. The district court reviewed the documents submitted by the government, including reports from the agents involved in investigating drug smuggling operations, and concluded that the documents were irrelevant, that the documents were inadmissible because they relied on hearsay, and that permitting the requested discovery would unnecessarily extend the litigation in violation of Fed. R. Evid. 403. After reviewing the documents,[7] we disagree both with the district court's characterization of the documents and with its application of the law.

Soto-Zuniga has maintained that, before being stopped at the checkpoint, he gave a ride to three teenagers at the request of Rios. It is possible that discovery about the investigation might help Soto-Zuniga identify the teenagers to whom he gave a ride. Those persons might then provide direct

---

[7] We grant the government's Motion to Transmit Documentary Evidence Under Seal for Ex Parte Consideration.

testimony on whether one or more of them placed drugs in the car of Soto-Zuniga without his knowledge. And even if not, they might potentially give information that would lead to the identification of the persons in question. Soto-Zuniga's defense was that the contraband must have been left in his car by the teenagers to whom he gave a ride because he knew nothing about it. If the persons are identified, they could potentially either support or contradict Soto-Zuniga's claim that he did not knowingly or intentionally possess the drugs, an element of the crime of which he was convicted of by a jury. *See* 21 U.S.C. § 841(a)(1).

Under Federal Rule of Criminal Procedure 16(a)(1)(E), Soto-Zuniga has a right to discovery of documents that are "material to preparing the defense." Materiality is a "low threshold; it is satisfied so long as the information . . . would have helped" to prepare a defense. *United States v. Hernandez-Meza*, 720 F.3d 760, 768 (9th Cir. 2013) (citation and internal quotation marks omitted). The test is not whether the discovery is admissible at trial, but whether the discovery may assist Soto-Zuniga in formulating a defense, including leading to admissible evidence. *See id.* ("Information is material even if it simply causes a defendant to completely abandon a planned defense and take an entirely different path." (citation and internal quotation marks omitted)); *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993) ("This materiality standard normally is not a heavy burden; rather, evidence is material as long as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." (citations and internal quotation marks omitted)). The district court erred by finding that the documents were not material to the defense and were not discoverable because

they were not admissible. We conclude that in this respect, the district court abused its discretion. *See United States v. Hinkson*, 585 F.3d 1247, 1261–63 (9th Cir. 2009) (en banc). We also conclude that there is a likelihood that the discovery of these documents would have identified the teenagers and changed the outcome of the trial. *de Cruz*, 82 F.3d at 866.[8]

It has been said that it "behooves the government to interpret the disclosure requirement broadly and turn over whatever evidence it has pertaining to the case." *Hernandez-Meza*, 720 F.3d at 768. While we recognize the sensitive nature of the documents in question, Soto-Zuniga's interest in government materials that are pertinent to his defense takes precedence. We reverse the district court's denial of Soto-Zuniga's discovery motion, vacate the conviction, and remand with instructions to grant the motion. *See Thomas*, 726 F.3d at 1098. We also instruct the district court to consider the government's request for a window of time before production to determine whether to continue to pursue this case, and to consider the government's request for protective measures that would maintain the security of the information in the documents while allowing Soto-Zuniga to adequately prepare a defense.

---

[8] The assessment of prejudice is different as to discovery of the names of the teenagers involved in smuggling by Rios, on the one hand, and discovery of checkpoint arrests statistics, on the other hand. On the former, we have the pertinent documents and can assess their materiality to the defense. On the latter, we do not have the arrest and search statistics and can express no conclusion on prejudice, and hence remand for the district court to assess prejudice in the first instance.

## III

Soto-Zuniga raises three additional arguments that we briefly address here.

First, he argues that the district court erred in denying his motion to suppress the drug evidence on the basis that the Border Patrol agents lacked probable cause to search the car. We review a denial of a suppression motion *de novo* and the underlying factual findings for clear error. *See United States v. Rodgers*, 656 F.3d 1023, 1026 (9th Cir. 2011).

Agents at a checkpoint may not search a private vehicle without a warrant unless they have consent or probable cause. *See United States v. Ortiz*, 422 U.S. 891, 896–97 (1975). Probable cause exists if there is a fair probability that contraband or evidence of a crime will be found in a particular place based on a totality of the circumstances. *United States v. Pinela-Hernandez*, 262 F.3d 974, 978 (9th Cir. 2001) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

Here, the district court made factual findings that supported probable cause, including (1) that Agent Rabreau smelled marijuana, (2) that the car had multiple air fresheners, (3) that there was a cigarillo wrapper and loose tobacco in the car, (4) that Soto-Zuniga appeared to be agitated and nervous, and (5) that Soto-Zuniga admitted to smoking marijuana in the car. Even if neither marijuana nor marijuana paraphernalia were ever recovered from the car, we conclude that the district court's factual findings were not clearly erroneous. Agent Rabreau testified that he smelled marijuana and that there was physical evidence in the car that made him suspect drug use or trafficking. Deference must be

given to the district court's determination that Agent Rabreau was credible.  *See Anderson v. City of Bessemer*, 470 U.S. 564, 573–76 (1985).  Also, other agents reported that Soto-Zuniga was agitated and at least one agent reported that Soto-Zuniga had admitted to smoking marijuana in the car.  We give due regard to the views of the agents, their recitals of what Soto-Zuniga said and did, and items seen in the car, once these have been confirmed by the district court's factual findings.

Viewing the entire record, we determine that the district court's account of the evidence is plausible, *see id.* at 573–74, and that the totality of the circumstances supported probable cause for the search.  *Cf. United States v. Koshnevis*, 979 F.2d 691, 695 (9th Cir. 1992) (holding that a driver's nervousness, inconsistent statements, and lies about not possessing a trunk key or a weapon constituted probable cause to search the car's trunk at an immigration checkpoint).  We stress that under the Supreme Court's standard in *Illinois v. Gates*, it is not certainty that is required to support a search or seizure but only probable cause, based on the total circumstances, that a search may yield evidence of crime.  462 U.S. at 238.  We affirm the district court's denial of Soto-Zuniga's suppression motion, insofar as it is based on a claimed lack of probable cause for the search of the car.

Soto-Zuniga also argues that the district court erred by instructing the jury, using the Ninth Circuit pattern jury instructions, that "[a] reasonable doubt is a doubt based upon reason and common sense and is not based purely on speculation."  Manual of Model Criminal Jury Instructions § 3.5 (9th Cir. 2010 ed.).  Soto-Zuniga contends that this phrasing interferes with the presumption of innocence.  But this argument is foreclosed by our precedent.  *See United*

*States v. Alcantara-Castillo*, 788 F.3d 1186, 1198 n.4 (9th Cir. 2015) (noting that we have "repeatedly upheld the use of the Ninth Circuit model jury instruction on reasonable doubt" and collecting cases).

Soto-Zuniga also argues that knowledge of drug type and quantity is an element of possession with intent to distribute in violation of 21 U.S.C. § 841. Soto-Zuniga contends that the Supreme Court's decision in *Alleyne v. United States*, 133 S. Ct. 2151 (2013), called our Circuit's case law on this issue into question. However, we have held that "*Alleyne* does not alter our precedent that a defendant's knowledge of the type and quantity of the controlled substance he imports is not such a fact, and therefore, not an element of the offense." *United States v. Jefferson*, 791 F.3d 1013, 1016 (9th Cir. 2015). The mens rea for the statute at issue in *Jefferson*, 21 U.S.C. § 960, is the same as the mens rea for the statute at issue in this case—that the defendant acted "knowingly or intentionally." We conclude that Soto-Zuniga's knowledge of the type and quantity of the drugs found in his car is not an element under 21 U.S.C. § 841. *See also United States v. Dado*, 759 F.3d 550, 570 (6th Cir. 2014) ("Drug type and quantity are irrelevant to [the] *mens rea* element" under this statute).

## IV

In conclusion, we vacate Soto-Zuniga's conviction and remand this case for a new trial. If the government decides to proceed, the district court shall permit discovery of the San Clemente checkpoint statistics. The court should also hold an evidentiary hearing on the checkpoint's constitutionality, and, as appropriate, publish an order or opinion on its findings. If the checkpoint is found to be constitutional, then the district

court shall also permit discovery of the investigation into Rios's drug smuggling operation.

The conviction is **VACATED,** the discovery rulings **REVERSED,** and the case **REMANDED, with instructions.**